IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JONATHON L. WOODS          )
                          )
v.                        )     No. 3:05-1080
                          )     Judge Campbell/Bryant
C/O LOZER, et al.         )


To:  The Honorable Todd J. Campbell, Chief Judge


## REPORT AND RECOMMENDATION

        This civil action was transferred to the docket of the
undersigned by order entered August 31, 2006 (Docket Entry No.
54).  Currently pending is defendants' motion for summary
judgment (Docket Entry No. 46), filed August 3, 2006.  Plaintiff,
proceeding *pro se*, has not responded to the summary judgment
motion nor the supporting statement of undisputed material facts
(Docket Entry No. 51).  Nonetheless, for the reasons given below,
the Magistrate Judge recommends that the motion be DENIED.


### I.  Background

        Plaintiff's amended complaint (Docket Entry No. 18)
names defendants Lozer, Werbeck, Garner, Harris, Taylor, Cecil,
O'Malley, and Munson -- all prison officials employed by the
Tennessee Department of Correction and stationed at Riverbend
Maximum Security Institution ("RMSI") in Nashville, Tennessee --
and alleges their liability under 42 U.S.C. § 1983 for damages

1

resulting from their cruel and unusual punishment of him, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Defendants' response to these allegations has been to deny any illegality in their treatment of plaintiff, including in their use of force to restrain him, their response to his medical needs, and their level of concern for his safety. (Docket Entry No. 35).

The parties of course offer differing accounts of the incident which gave rise to this lawsuit, defendants in their statement of undisputed facts and affidavits (Docket Entry Nos. 48-52), and plaintiff in his sworn amended complaint.[1]

Plaintiff's account of the facts, in summary, would show that on October 25, 2005, around five or six o'clock in the evening, officers Lozer, Harris, Werbeck, Garner, and O'Malley came to his cell to remove his handcuffs; that when he put his

---

[1]While this Court's local rules provide that the failure to respond to a motion shall indicate that there is no opposition to the motion, L.R. 7.01(b), and that the failure to respond to the moving party's statement of undisputed facts shall indicate that those facts are not disputed for purposes of summary judgment, L.R. 56.01(g), the Sixth Circuit has held that disputations of fact contained in a sworn or verified complaint are sufficient to rebut an otherwise unopposed motion for summary judgment, and that the disputes between the verified complaint and the summary judgment affidavits "must be addressed before the district court may dismiss the case." Williams v. Browman, 981 F.2d 901, 904-05 (6th Cir. 1992)(quoting 28 U.S.C. § 1746(1988)); e.g., Hartsfield v. Isom, 51 F.3d 272, 1995 WL 150333 (6th Cir. April 5, 1995)(reversing entry of summary judgment for defendant based on disagreement between unopposed summary judgment materials and the allegations of the verified complaint and amended complaint). Plaintiff here has sworn to the allegations of his amended complaint, under penalty of perjury, and under seal of a notary public. Accordingly, plaintiff's factual allegations are considered as proof for purposes of this report.

arms out of the "pie flap"[2] his arm was "snatched" by defendant

Lozer, resulting in the top of his arm being scraped on the

inside of the pie flap; that he was bleeding as a result of the

scrape and told defendant Lozer and other defendants who were

also pulling or twisting his arm to let go, but that the

defendants kept pulling on the arm; that defendant Lozer told

defendant Werbeck to "hold his hands out," whereupon defendant

Lozer pulled out some sort of blade, described by plaintiff as

"something shin[y]," and cut plaintiff's wrist on the left side;

that the cut was very deep, to the bone, requiring thirty

stitches (fifteen internal "cat guts" stitches and fifteen

external stitches) to close; that defendant Garner was slamming

the "side flap" on plaintiff's arm "like he was trying to cut

[the] arm off"; that defendant Cecil then walked into the pod,

whereupon the other officers stopped what they were doing and

cuffed one of plaintiff's hands to the cell door; that plaintiff

was "constantly bleeding from both [wounds] ... all over the

door, the floor, on [plaintiff], in the pie flap"; that Lozer and

the other participating defendants tried to wipe up some of the

---

[2]The "pie flap" in plaintiff's cell is referred to by defendants as a "special pie flap," which was installed to provide extra security against inmates who have displayed especially aggressive, violent behavior. This pie flap is a metal box attached to the outside of the cell door. The box has a thick plexiglass top with a lock, and on the inmate's end there is a movable back access plate which also has a lock. Items such as food trays may thus be placed in the box by prison staff, who then lock the plexiglass top before unlocking the interior back access plate, so that prison staff do not have direct contact with the inmate when delivering such items. However, when handcuffs need to be applied or removed, both pie flap openings must be opened at the same time. (Docket Entry No. 51 at ¶4).

3

blood so that defendants Cecil (an internal affairs officer) and Tyler (a captain among the ranks of correctional officers) would not see how bad the cut was; that plaintiff tried to explain what had happened to defendant Cecil, but that she just looked at plaintiff's wounds without asking any questions; that the prison medical staff was finally called after at least twenty-five minutes; that his stitching and other medical treatment by Dr. David Miller took four to five hours; that no pictures were ever taken at the scene of this incident, but that in addition to the defendants, four correctional officers named Phillips, Cross, Hackfield, and Galloway witnessed the scene, as they removed plaintiff from his cell to the prison's infirmary. (Docket Entry No. 18).

Defendants' proof, as recited in their statement of undisputed facts (Docket Entry No. 51), shows as follows:

On October 25, 2005, Gregory Garner was a Correctional Sergeant at RMSI and was the officer in charge assigned to Unit 1. Kareem Lozer and Kelly Werbeck were Correctional Officers ("CO") who were assigned to Unit 1 on October 25, 2005.

CO Kareem Lozer was called into D housing Pod by Sgt. Garner to bring a full set of restraints to restrain inmate Woods for a cell search. Inmate Woods was placed in the D Pod passive room without incident. CO Werbeck performed the search of inmate Woods' cell.

4

CO Lozer was then called back to D Pod by Sgt. Garner after inmate Woods became combative when he was returned to his cell. CO Lozer removed inmate Woods' leg irons and chains. Sgt. Garner gave inmate Woods a direct order to sit on his bed until the officers closed his cell door. Inmate Woods then rushed to CO Lozer as the officer tried to close his cell door. CO Lozer then gave inmate Woods a direct order to step back, and he refused. Inmate Woods proceeded to charge the door again. CO Curtis Harris and CO Lozer proceeded to push inmate Woods back to his bed. CO Harris then talked to inmate Woods to get him to comply and he agreed.

Once the cell door closed, CO Lozer asked inmate Woods to place his hands through the "special pie flap" which was opened. CO Lozer removed one handcuff when inmate Woods tried to pull CO Lozer's hand and arm through the pie flap. CO Lozer then pulled his arm back thru the pie flap to gain control of the situation. CO Lozer pulled inmate Woods' arm up through the pie flap at which time CO Harris and CO Kelly Werbeck, assisted CO Lozer in restraining inmate Woods by attaching the handcuff to his cell door handle.

Captain Tyler responded to Unit 1 after receiving a radio communication from Sgt. Garner. A struggle had ensued with inmate Woods attempting to pull away from CO Lozer, Werbeck and Harris, and the officers trying to maintain control of the

5

handcuffs. In the process of attempting to regain control of the unruly inmate, the officers attached the wrist that was still cuffed to the cell door handle. Officer Werbeck and inmate Woods had received an injury during the struggle. Officer Werbeck had injured a finger, which later required stitches and treatment by a medical doctor outside the prison, and inmate Woods had received an injury to his arm above his wrist. Sgt. Garner had applied a pressure bandage to Woods' injury.

After quickly checking on Officer Werbeck, Capt. Tyler proceeded to inmate Woods' cell. As he approached, he could see some spots of blood both on the floor and on the "special pie flap" of inmate Woods' cell door. Inmate Woods was still cuffed to the handle of his cell door, however, he was not bleeding.

Inmate Woods was highly agitated and yelling threats at everyone in the pod. Capt. Tyler attempted to speak with him with no success at all. Capt. Tyler informed the officers present that he was not going to authorize the removal of the restraints until Woods calmed down and directed all staff to leave the pod. The nurse, who was with Capt. Tyler, advised that she felt it was a reasonable course of action.

Capt. Tyler remained at the door of the pod so he could observe inmate Woods, and when he stopped yelling Capt. Tyler went back to his cell and asked him if he were ready for the Captain to take the restraints off so he could get additional

6

medical attention. Inmate Woods replied that he was, and Capt. Tyler removed the handcuffs. He had staff members not assigned to the unit escort inmate Woods to the clinic, and after treatment, return him to his cell.

During the incident and struggle, inmate Woods damaged the handcuffs to such an extent that the cuffs had to be cut off the door handle because a key was lodged in the lock.

Attached as Attachment 3 to the Affidavit of Michael Tyler (Docket Entry No. 52) is a true and exact copy of the Incident Report (#00634446) for this October 25, 2005 incident with inmate Woods. The Incident Report reads as follows:

> On the above date and time after returning i/m Woods #337230 to his cell after a cell search Officer Lozer was removing the handcuffs when Officer Lozer got one cuff off, i/m Woods tried to grab Officer Lozer's arm and pull it through the pie flap. At that time Officer Lozer with the assistance of Officer Harris did manage to get i/m Woods' arm handcuffed to the outside door handle in order to gain control of i/m Woods. During the altercation Woods injured his arm. Medical was called and responded to unit one. Officer Werbeck did substain [sic] a cut to her finger. Officer Werbeck was seen by medical and sent to outside Dr. for evaluation. When the nurse went to check on Woods, he refused treatment he was yelling and threatening staff. When he calmed down and complied to legal lawful orders he was escorted to the infirmary for treatment.

Sgt. Garner made an entry into the unit log book on October 25, 2005, which documented the events as follows:

> Cell search on Woods 337230 cell D105. Complyed [sic] w/all orders until he was returned to his cell at which time he become resistant but did settle down so we could get the restraint off him, however, when C/O Lozer was taking the restraints (handcuffs) off through

7

the pie flap, he got one cuff off and attempted to jerk
away from C/O Lozer while attempting to keep handcuffs
away from I/M Woods, his arm got cut on the door pie
flap.  In order to control I/M, his arm was cuffed to
the door handle, he had a cut on his lower arm medical
was called and came to unit one.  Capt. Tyler also
responded to the unit during the altercation.  C/O
Werbeck received a cut on the left forefinger; was
treated by nurse Doty and sent to Baptist Centricare to
be checked out.  When the nurse arrived at Woods' cell
he was very belligerent and refused treatment he was
threatening all staff when he settled down he was
escorted to the infirmary by Sgt. Phillips, C/O Cross
and C/O Nieces for treatment.  Woods is being charged
with R.D.S. [Refusing Direct Order], A.O.S. [Assault on
Staff] & D.S.P. [Destroying State Property].  Woods was
escorted to the inf[irmary] at 1829.

    Attached to Sgt. Garner's Affidavit (Docket Entry No.

50) is a true and exact copy of the log book page.

    Attached to the Affidavit of Michael Tyler as

Attachment 4 is a true and exact copy of the Disciplinary Report

(#00634539) with hearing documents, which was issued to inmate

Woods for Assault on Staff on October 25, 2005.  Sgt. Gregory

Garner was the reporting officer, and the description reads as

follows:

    On the above date and approx. time while Officer Lozer
    was removing hand cuffs from i/m Woods #337230 he
    sttempted [sic] to pull offizer's [sic] arm in through
    the pie flap as soon as Officer Lozer got one handcuff
    off Officers Lozer, Harris and Werbeck were able to get
    i/m Woods arm handcuffed to the outside door handle of
    his cell door.  During the altercation, officer Werbeck
    a [sic] cut to her finger on her left hand that
    required her to be sent for outside medical attention
    which did result in c/o Werbeck needinf [sic] stitches.
    Woods is being charged with A.O.S. [Assault on Staff].
    I request that Woods pay for all medical bills and
    Officer Werbeck's lost time from work.  She is on
    assault leave.

8

Inmate Woods was convicted of Assault on Staff by the disciplinary board on November 9, 2005. Inmate Woods received a sentence of thirty (30) days punitive segregation time and six (6) months of good time sentence credits were taken.

This was a Class A disciplinary conviction, and inmate Woods had a right to appeal to the RMSI Warden, and if still dissatisfied, he could appeal to the TDOC Commissioner. Inmate Woods did not appeal this disciplinary conviction. Attached to the Affidavit of Michael Tyler as Attachment 5 is a true and exact copy of the TOMIS (Tennessee Offender Management Information System) disciplinary document that shows that inmate Woods did not appeal this disciplinary decision.

## II. Discussion

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A "genuine issue of material fact" is one that would change the outcome of the litigation; factual disputes that are irrelevant or unnecessary will not be counted. Anderson v. Liberty Lobby,

9

477 U.S. 242, 247 (1986).

In order to defeat a motion for summary judgment, the non-moving party must adduce evidence which would be sufficient for a jury to return a verdict in his favor. Id. at 249. For purposes of summary judgment, the court must view the evidence in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B. Analysis of the Motion

Defendants argue that they are entitled to judgment as a matter of law, citing authority from the United States Supreme Court for the proposition that plaintiff's claims under 42 U.S.C. § 1983 are not cognizable because they effectively challenge the length of his prison sentence. Defendants further argue that the undisputed facts justify summary judgment on the merits of plaintiff's claims of cruel and unusual punishment and deliberate indifference to his safety.

With all due respect to these latter arguments, it is difficult to imagine the essential facts surrounding the cause and extent of plaintiff's injuries, as well as the subjective state of mind of defendants in light of those injuries, being any more in dispute. The record contains sworn statements to the effect that plaintiff either suffered a simple abrasion and only light bleeding from a tug-of-war that he initiated, or that his

10

arm was abraded just before his wrist was held and sliced open by a concealed blade of some sort, with copious bleeding and further trauma to the arm inflicted by slamming it with the pie flap door. No medical proof has been submitted to substantiate either side's account. Accordingly, plaintiff's claims, if cognizable under § 1983, must surely survive summary judgment on their merits.

Defendants' primary argument attacks plaintiff's claims as improperly brought under § 1983, since his allegations effectively challenge his assault on staff disciplinary conviction and sentence to loss of good-time credits, which were not appealed to the Warden of the prison or otherwise through state law channels. The law governing this issue has evolved from Preiser v. Rodriquez, 411 U.S. 475 (1973), where the Supreme Court considered the potential overlap between the civil rights and habeas corpus statutes, and held that habeas is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983. Id. at 488-490. In so holding, the Preiser Court found the actions before it, for restoration of good-time credits, to be "within the core of habeas corpus in attacking the very duration of ... physical confinement itself," regardless of whether the restoration of good-time credits would result in immediate

11

release from custody or simply a shortening of the stay in custody. Id. at 487-88. The following year, the Supreme Court deemed it proper under Preiser for the lower courts, in an action brought under § 1983, "to determine the validity of the procedures for revoking good-time credits and to fashion appropriate remedies for any constitutional violations ascertained, short of ordering the actual restoration of good time already canceled." Wolff v. McDonnell, 418 U.S. 539, 554-55 (1974).

Twenty years later, the Supreme Court published its decision in Heck v. Humphrey, 512 U.S. 477 (1994), which bars § 1983 plaintiffs from advancing claims that, if successful, "would necessarily imply the invalidity" of a prior conviction or sentence, unless the prior conviction or sentence has previously been invalidated. Id. at 487. Heck thus requires "favorable termination" of the plaintiff's efforts in appealing the prior conviction or sentence through state channels or through federal habeas application, prior to a suit for damages under § 1983. "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed..." Id. (emphasis in original).

In Edwards v. Balisok, 520 U.S. 641, 645-48 (1997), the

12

Court revisited the prison discipline setting, and extended the Heck rationale to a § 1983 claim which did not directly implicate the inmate's confinement, but which implicated the proceedings by which internal, sentence-affecting discipline was imposed. The Court held in that case that the claimed deceit and bias of the hearing officer, if established, would implicitly invalidate the deprivation of the inmate's good time credits. The Court thus held that Balisok's claim was not cognizable under § 1983. Id. at 648.

In the wake of these Supreme Court decisions, the Sixth Circuit has addressed the issue on numerous occasions, mostly in unpublished opinions, with inconsistent conclusions being reached by the different panels of the court. In Nelson v. Sharp, 182 F.3d 918, 1999 WL 520751 (6th Cir. July 14, 1999), the inmate alleged that upon his refusal to remove his hand from the pie flap door, the defendant prison guard purposely slammed the door on his hand and leaned on the door in order to injure the inmate's hand, and then filed a false misconduct report on the inmate. The Sixth Circuit affirmed the dismissal of several of Nelson's constitutional claims, including an Eighth Amendment claim of deliberate indifference to Nelson's serious medical needs arising from the alleged failure to treat his hand injury, but reversed the district court's dismissal of Nelson's Eighth Amendment claim "based on the degree of force used by Sharp in

13

response to Nelson's refusal to remove his hand from the food slot door." Id. at *1. The court provided the following analysis:

> With respect to plaintiff's Eighth Amendment claim against defendant Sharp, however, there is a genuine issue of material fact. Sharp defends on the grounds that the prison disciplinary system correctly held that Nelson had refused a direct order to remove his hand from the food slot, and therefore allowing Nelson's claim to proceed would be an improper relitigation of his disciplinary conviction, citing *Heck* and *Edwards*. However, the question of the degree of force used by the prison guard is analytically distinct from the question of whether Sharp violated prison rules by keeping his hand in the food slot and thus preventing Sharp from properly closing the food slot. For example, Nelson's violation presumably would not have justified the guard in hacking off the offending hand with an ax, or spraying the cell with sub-machine gun fire through the food slot. Although Nelson's actions were clearly not of such an outrageous character, at this stage it is not beyond the realm of possibility that Sharp can prove that Nelson violated his Eighth Amendment rights by slamming the food slot door on his hand in such a manner as to inflict unnecessary pain in a wanton manner, not justified by prison necessity or the degree of violation.

Id. at *2 (internal citations omitted).

Some two months later, in Bailey v. McCoy, 191 F.3d 451, 1999 WL 777351 (6th Cir. Sept. 21, 1999), the court cited many of its prior unpublished opinions, noting that they all addressed Edwards v. Balisok in the context of procedural due process challenges, but that the court "ha[d] never applied *Edwards* to an Eighth Amendment claim." Relying on this history, and in particular on the decision in Smith v. Sapp, 1998 WL 384620 (6th Cir. June 19, 1998), cert. denied, 119 S.Ct. 234

14

(1998), where the court had applied <u>Edwards</u> to bar Smith's

procedural due process claim, but chose not to apply <u>Edwards</u> to

Smith's Eighth Amendment claim, the <u>McCoy</u> court concluded that

the district court erred in applying <u>Edwards</u> to the cruel and

unusual punishment claim before it.  However, exactly one week

later, a different panel of the Sixth Circuit applied <u>Edwards</u> to

overturn a jury verdict in the inmate's favor on an Eighth

Amendment claim, where the inmate sought damages for cruel and

unusual punishment in the prison guard's filing of a false

misconduct report, leading to the inmate's disciplinary

conviction and time served in segregation.  <u>Riley v. Kurtz</u>, 194

F.3d 1313, 1999 WL 801560 (6th Cir. Sept. 28, 1999).

In <u>Huey v. Stine</u>, 230 F.3d 226 (6th Cir. 2000), the

Sixth Circuit published a decision addressing the applicability

of <u>Heck</u> and <u>Edwards</u> to Eighth Amendment claims, and reconciling

the unpublished opinions cited above.  <u>Huey</u> also involved facts

somewhat similar to <u>Nelson</u> and the case at bar, to wit:

> Once inside the cell, Huey moved his hands to the
> door's food slot so that Stine could remove his
> handcuffs.  Stine allegedly grabbed Huey's right hand,
> pulled it through the slot, and began twisting Huey's
> arm, saying to another officer present at the scene,
> "I'll bend his fingers back.  Let's see if he can take
> that."  When other officers approached the cell, Stine
> released him.  Stine then filed a false misconduct
> report.  Huey maintains that as a result of the
> incident he suffered abrasions that produced scarring,
> and restricted movement in his wrist for four to six
> days.

<u>Id.</u> at 227-28.  The allegedly false misconduct report filed by

15

the guard in <u>Huey</u> charged the inmate with assaulting the guard in an attempt to gain control of a handcuff key. On hearing the matter, the hearing officer did not credit the inmate's version of the facts, noting that if the guard had actually tried to break his arm, it likely would have been broken, and that the medical records revealed treatment for only a minor abrasion that would have been consistent with a back and forth struggle for the handcuff key through the food slot. The hearing officer found the inmate guilty of assault and battery, and sentenced him to detention and loss of privileges. <u>Id.</u> Huey unsuccessfully moved for rehearing of the disciplinary charge, and also initiated the prison's grievance process to dispute the facts underlying the assault charge. Receiving no relief on his grievance, Huey filed suit under § 1983, alleging that "because he had not assaulted officer Stine, Stine's actions were cruel and unusual punishment in violation of the Eighth Amendment." <u>Id.</u> at 228.

In response to Huey's argument that <u>Heck</u> should not bar his Eighth Amendment claim, the Sixth Circuit acknowledged that "[i]n general, the federal courts hold that Eighth Amendment claims do not fun afoul of *Heck* because the question of the degree of force used by a police or corrections officer is analytically distinct from the question whether the plaintiff violated the law." <u>Id.</u> at 230. The court proceeded to review the results in <u>McCoy</u>, <u>Riley</u>, and <u>Nelson</u> before announcing the

16

following ruling:

> We think the rule that can be taken from these cases is
> that *Heck* generally does not bar Eighth Amendment
> claims, but if the claim is founded solely on an
> allegation that a corrections officer falsified a
> misconduct report, then *Heck* applies.  Such is the case
> here.  Huey does not claim that Stine's actions were an
> excessive response to his attempt to gain control of
> the handcuff key (in contrast to *Nelson*, where the
> basis of the plaintiff's claim is unclear).  Rather,
> Huey claims that Stine's arm-twisting was cruel and
> unusual punishment because Huey had done nothing wrong
> and he therefore should not have been punished at all.
> Granting relief on Huey's complaint would require that
> we annul the judgment of the Michigan Department of
> Corrections.  *Heck* forbids that result.

<u>Id.</u> at 231.

Following the Sixth Circuit's ruling in <u>Huey</u>, another
panel of the court relied on that case in affirming the dismissal
of a claim that a false misconduct charge was filed against the
inmate in retaliation for prior lawsuits and grievances, noting
that the inmate's request that the misconduct conviction be
expunged from his record placed the matter "directly within the
doctrine of *Heck*..." <u>Muhammad v. Close</u>, 47 Fed.Appx. 738, 2002
WL 31114769 (6th Cir. Sept. 23, 2002).  However, the Supreme
Court reversed the Sixth Circuit's decision in <u>Close</u>, finding
that decision "flawed as a matter of fact and as a matter of
law." <u>Muhammad v. Close</u>, 540 U.S. 749, 754 (2004).  Factually,
the Supreme Court noted that Muhammad's amended complaint did not
seek the expungement of the disciplinary charge from his prison
record, but merely sought to recover compensatory and punitive

17

damages. More importantly, the Supreme Court found that the
Sixth Circuit erred in relying on the "mistaken view" expressed
in Circuit precedent on the issue, that <u>Heck</u> applies
categorically to all suits challenging prison disciplinary
proceedings. In fact, the Supreme Court made clear that the
requirement of <u>Heck</u> and its progeny that the prisoner first win
reversal of the underlying conviction or sentence before claiming
damages under § 1983, is not applicable where the prison
disciplinary proceedings did not "affect the duration of time to
be served (by bearing on the award or revocation of good-time
credits)..." <u>Id.</u> at 754.

Recognizing this partial overruling of <u>Huey</u>, the Sixth
Circuit issued a recent unpublished opinion foreclosing a § 1983
claim to the extent that it challenged a disciplinary conviction
which affected the inmate's parole. <u>McMillan v. Fielding</u>, 136
Fed.Appx. 818 (6th Cir. June 7, 2005). The <u>McMillan</u> court cited
<u>Huey</u> for the proposition that "[a] prisoner found guilty in a
prison disciplinary hearing cannot use § 1983 to collaterally
attack the hearing's validity or the conduct underlying the
disciplinary conviction." <u>Id.</u> at 820. However, in considering a
challenge to the procedures by which parole eligibility was
determined, the Supreme Court had clarified three months earlier
that such a collateral attack is not precluded in and of itself,
but only where the attack, if successful, would necessarily lead

18

to restoration of good-time credits.  Wilkinson v. Dotson, 544 U.S. 74, 83-84 (2005).  Since a successful challenge to the procedure by which an inmate's parole eligibility was denied would not necessarily affect his sentence, but "means at most new eligibility review, which at most will speed consideration of a new parole application ... [or allow] a new parole hearing at which [the] parole authorities may, in their discretion, decline to shorten his prison term," the Wilkinson Court held that the § 1983 action before it was not barred by Heck, et al.  Id. at 82.  The Court distilled its jurisprudence on the issue as follows: "[Preiser, Wolff, Heck, and Edwards], taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) – if success in that action would necessarily demonstrate the invalidity of confinement or its duration."  Id. at 81-82.

Considering this legal landscape, including the continuing validity of Huey's teachings on the applicability of Heck to Eighth Amendment claims, despite the former's partial overruling by Close, the case at bar presents the ultimate question of whether plaintiff's claims, if successful, would necessarily imply the invalidity of plaintiff's assault on staff

19

conviction and result in the restoration of his lost good-time credits; the narrower question is whether or not his claims are "founded solely on an allegation that a corrections officer falsified a misconduct report," for if they are not, then they are "analytically distinct" from the question of whether plaintiff was in fact guilty of the assault of which he was convicted.  <u>Huey</u>, 230 F.3d at 230-31.  The undersigned concludes that the answer to both questions is no.

As a threshold matter, <u>Heck</u> is in play here, as the record shows that plaintiff's punishment for the assault on staff conviction included the deprivation of six months of good time sentence credits, as well as thirty days of punitive segregation during which he was statutorily ineligible to earn any further good time credits.  Tenn. Code Ann. § 41-21-236(a)(7); Docket Entry No. 52-4.

From the standpoint of this Circuit's published authority, the question of whether defendants violated plaintiff's Eighth Amendment rights is analytically distinct from the issue of plaintiff's assault conviction, unless his claims are founded solely on the allegation that he was falsely accused of assault.  In their summary judgment memorandum, defendants state that "Mr. Woods in this action denies that he assaulted anyone <u>and claims that he was charged with the disciplinary infraction as part of a conspiracy to protect the wrongdoing of</u>

20

<u>the defendants</u>." (Docket Entry No. 47 at 5)(emphasis added).
Defendants do not follow this statement with any citation to the
record. In fact, plaintiff's amended complaint does not appear
to contain any such conspiracy allegation, nor any allegation
which bears on the motive behind the filing of the disciplinary
report against him. The closest plaintiff's amended complaint
comes to attacking the validity of the disciplinary charge or
proceedings against him are the few allegations that the
officers' actions against him were "unprovoked." (Docket Entry
No. 18 at 5, 8, 10). Plaintiff further alleges that defendants
Harris and Harp were pulling on his arm "for no reason at all,"
since he could not with one arm have been offering much
resistance against the several officers who were already pulling
on the arm before these defendants joined in. (<u>Id.</u> at 7, 10).
However, these allegations do not explicitly pertain to the
particulars of plaintiff's assault conviction, nor do they imply
that plaintiff was entirely passive during the course of events
which spawned the assault charge. The actions alleged to have
been taken without provocation were those of the officers who
initially pulled, snatched, or held his arm, causing the abrasion
to plaintiff's arm and contributing to the struggle and verbal
altercation that ensued. Plaintiff specifically alleges that CO
Lozer (among other defendants) used excessive force "by pulling
my arm without being provoked," and by using a blade to cut him,

21

without mentioning any lack of provocation. (Id. at 5, ¶ 26).
Thus, unlike the prisoner in Huey, whose complaint alleged cruel
and unusual punishment on the sole basis that he "had done
nothing wrong and he therefore should not have been punished at
all," 230 F.3d at 231, plaintiff's amended complaint alleges
cruel and unusual punishment in the defendants' grabbing and
pulling of his arm because he had done nothing wrong to provoke
these actions, but also leaves open the possibility that the
alleged cutting of his wrist and subsequent events will prove to
be violations of his Eighth Amendment rights because they were an
excessive or otherwise malicious response to defendant Werbeck's
injury.

   While plaintiff does suggest that his alleged
mistreatment at the hands of defendants began as an act of
retaliation for a prior incident involving defendant Werbeck (id.
at 7), he does not dispute the fact that Werbeck was injured
during the altercation.  While there might appear to be some
conflict between plaintiff's allegations as to how the
altercation arose and who started it, and the statements of
Officers Garner, Lozer and Harris at plaintiff's disciplinary
hearing that it was plaintiff who "jerked away" from CO Lozer and
attempted to pull CO Lozer's arm through the pie flap (Docket
Entry No. 52-4), the hearing officer did not make any specific
finding as to who started the altercation, nor was any such

finding necessary to support the conviction for assault on staff.
Consequently, plaintiff's few allegations that defendants'
actions were unprovoked and motivated by retaliatory animus does
not support defendants' interpretation of the basis for his
complaint.

It is important to note that the assault charge against
plaintiff appears to have been based exclusively upon the injury
to defendant Werbeck's finger, rather than plaintiff's resistence
to the authority of the guards on the whole (Docket Entry No. 52-
4). The misconduct charge was filed by defendant Garner, acting
as defendant Werbeck's supervisor and in her absence, and
requesting that "Woods pay for all medical bills and Officer
Werbeck's lost time from work." The only finding of fact made by
the prison hearing officer was that "Woods' actions caused
Officer Werbeck to be injured." In determining whether <u>Heck</u> bars
a § 1983 claim, the timing of the alleged constitutional
violations in relation to the proven disciplinary or state law
violations may be pivotal. <u>See</u> <u>Smith v. City of Hemet</u>, 394 F.3d
689, 697-98 (9th Cir. 2005)("Under *Heck*, Smith would be allowed
to bring a § 1983 action, however, if the use of excessive force
occurred *subsequent to* the conduct on which his conviction was
based."). In the instant case, Officer Werbeck stated at
plaintiff's disciplinary hearing that "I cut my finger when Woods
tried to pull away from Off[icer] Lozer. I grabbed the cuffs to

23

help Lozer and that is when I got my hand cut." (Docket Entry No. 52-4). This would place the injury to defendant Werbeck at the very outset of the altercation, prior to the alleged cutting, pulling, and twisting of plaintiff's arm and the slamming of the pie flap door upon the arm, as well as whatever medical attention or lack thereof was afforded plaintiff. While plaintiff's amended complaint is silent on the circumstances of Werbeck's injury, it simply does not allege facts that, if proven, "would necessarily demonstrate the invalidity of" his assault conviction. <u>Wilkinson</u>, 544 U.S. at 81-82. Where there is room for the facts alleged by plaintiff and the facts essential to the judgment of the state agency to peacefully co-exist, the § 1983 action must be allowed to go forward. <u>Heck</u>, 512 U.S. at 487.

It is furthermore clear that plaintiff's claims are not founded <u>solely</u> on an allegation that the misconduct report filed against him was falsified, but are among the general class of Eighth Amendment claims which are analytically distinct from the fact of his guilt on the assault charge. As in <u>Nelson</u>, the fact that plaintiff caused the injury to defendant Werbeck's finger -- whether of his own volition in trying to pull his handcuffs through the pie flap or in reaction to defendants grabbing and pulling his arm -- presumably would not justify the actions allegedly taken against him, and thus it is entirely possible that plaintiff can prove an Eighth Amendment violation regardless

24

of "prison necessity or the degree of [his own] violation."

Nelson, 1999 WL 520751 at *2. Accordingly, the undersigned must conclude that the instant lawsuit is not barred.

The Sixth Circuit's decision in Cummings v. City of Akron, 418 F.3d 676 (6th Cir. 2005), does not compel the opposite conclusion. In Cummings, the court considered the application of Heck to a Fourth Amendment excessive force claim under § 1983, finding the claim precluded as it would necessarily imply the invalidity of the plaintiff's state court conviction for assaulting the police officer. The court reasoned as follows:

> The struggle between Cummings and the officers gave rise to both Cummings' assault conviction and the excessive force claim, and the two are inextricably intertwined. Additionally, Cummings could have raised excessive force as a defense to the assault charge, but instead he chose not to contest the charge. Thus, we hold that Heck bars Cummings' excessive force claim from moving forward...

Id. at 682-83. This decision is distinguishable from a context standpoint, as it involved a Fourth Amendment issue rather than the Eighth Amendment issues presented here. Moreover, there was no real dispute in Cummings over what blows were struck, but only over the extent to which the force applied was excessive. Here, there are glaring factual disputes as to the harm inflicted upon plaintiff, but not as to the harm inflicted upon any defendant. Finally, as noted above, it appears that the most egregious of defendants' unlawful actions are alleged to have occurred after defendant Werbeck sustained the injury upon which plaintiff's

25

assault conviction was based, and therefore plaintiff could not have raised the alleged excessive force as a defense to the assault charge.  Given these distinctions and the prior holdings of the Sixth Circuit in the specific context of Eighth Amendment claims related to the results of disciplinary proceedings and convictions, the undersigned concludes that there is no conflict between the "inextricably intertwined" standard applied in Cummings and the result reached here.

Finally, it is true that plaintiff in his amended complaint prays for relief including "to be remove[d] from max back to general population (ASAP) and recover my good time credits ... for 2 years ..." (Docket Entry No. 18 at 13).  This request for recovery of good-time credits appears to be directed at whatever credits he may have lost during his assignment to a maximum security housing unit within the prison.  However, even if the request were aimed at the credits he lost during his punitive segregation and otherwise as a result of his assault conviction, the Supreme Court in Wolff made clear that while this relief is foreclosed in a § 1983 action, the claims for damages properly brought under § 1983 could go forward.  Wolff, 418 U.S. at 554-55 (citing Preiser, 411 U.S. at 499 n.14).

In sum, despite plaintiff's failure to properly oppose defendants' summary judgment motion, the undersigned concludes (1) that the factual disputes apparent from the sworn allegations

26

of his amended complaint versus the affidavits submitted by defendants preclude summary judgment on plaintiff's Eighth Amendment claims, and (2) that the rule of <u>Heck v. Humphreys</u> does not pretermit these factual issues inasmuch as plaintiff's claims do not require the unwinding of the disciplinary hearing officer's judgment, nor would success on those claims necessarily imply the invalidity of plaintiff's conviction and his resulting loss of good-time credits.

### III. Recommendation

In light of the foregoing, the Magistrate Judge recommends that defendants' motion for summary judgment be DENIED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

27

**ENTERED** this 9th day of November, 2006.

        s/ John S. Bryant
       JOHN S. BRYANT
       UNITED STATES MAGISTRATE JUDGE

Case 3:05-cv-01080   Document 57   Filed 11/09/06   Page 28 of 28 PageID #: 260